## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WAYNE MORRIS, | * | |
| Plaintiff | * | |
| v | * | Civil Action No. RDB-20-3487 |
| CORIZON, | * | |
| MEDICAL STAFF, | | |
| HOLLY HOOVER, (*nee Pierce*)[1] | * | |
| JANETTE CLARK, | | |
| OTHERS UNKNOWN, | * | |
| Defendants | * | |

\*\*\*

## <u>MEMORANDUM OPINION</u>

The self-represented plaintiff Wayne Morris is a Maryland state inmate.  He alleges that defendants Corizon Health, Inc., Holly Hoover (nee Pierce), NP, and Janette Clark, NP (collectively, "Defendants') provided inadequate medical treatment for the knee injury he sustained at North Branch Correctional Institution ("NBCI").[2]  Plaintiff also claims that Clark made false statements about his medical care.  Plaintiff has filed a Motion for Appointment of Counsel (ECF No. 22), which will be denied.[3]

---

[1] The Clerk will change Defendant's name on the docket to Holly Hoover (nee Pierce).  *See* ECF 20-1 at 1.

[2]  Plaintiff is presently housed at Western Correctional Institution.

[3]  Plaintiff asserts that he is indigent, his imprisonment limits his ability to research and litigate the issues, and he has a limited knowledge of the law.  ECF No. 22.  In civil cases, a federal district court judge has the discretion under 28 U.S.C. § 1915(e)(1) to appoint counsel, but only if an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982).  Plaintiff has adequately outlined his claims, the claims are not unduly complicated, and no hearing is necessary.  Because there are no exceptional circumstances for appointment of counsel, this Court will deny the motion.

Pending is Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment with exhibits and declarations, to which Plaintiff has filed an opposition.[4] (ECF Nos. 20, 25).  Upon review of the submissions, this Court finds a hearing is unnecessary to resolve the issues.  *See* Local Rule 105.6 (D. Md. 2021).  For the reasons stated below, Defendants' dispositive motion is GRANTED.

## BACKGROUND

### A. Plaintiff's Allegations

Plaintiff alleges that on May 24, 2019, he injured his left knee while playing basketball at NBCI, and was given crutches, an ace bandage and "sent on my way."  ECF No. 3 at 3.  On May 31, 2019, his knee was x-rayed, and on June 7, 2019, he was "finally given some Tylenol," although it did not help him.  *Id*.  Two months passed before he was seen by Nurse Practitioner Holly Hoover, who ordered physical therapy without diagnosing his medical issue.  Plaintiff told Hoover and the physical therapist that he was in severe pain.  *Id.*

On September 2, 2019, Dr. Carls,[5] a surgeon, evaluated Plaintiff's knee and recommended an MRI and immediate surgery.  On October 28, 2019, Hoover told Plaintiff that she did not see Dr. Carls' medical notes or recommendation for an MRI.

On November 19, 2019, Plaintiff had an MRI which showed three torn ligaments in his knee.  Plaintiff was transferred to Western Correctional Institution ("WCI") on November 23, 2019.  *Id*. at 4.

---

[4] Plaintiff was mailed a notice, advising him of Defendants' motion and his opportunity to respond and provide exhibits, affidavits, and declarations. *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir.1975)(holding *pro se* plaintiffs should be advised of their right to file responsive material to a motion for summary judgment). Plaintiff filed no affidavits or other verified evidence with his opposition.

[5] Plaintiff refers to this physician as "Dr. Carl." ECF No. 1.

On February 11, 2020, Dr. Carls again recommended immediate surgery for Plaintiff. *Id.* at 5. On July 31, 2020, Dr. Carls surgically repaired Plaintiff's torn ligaments. *Id.*

Plaintiff also complains about his post-operative care. On August 1, 2020, Nurse Practitioner Janette Clark confiscated his knee brace and ice pack and discharged him from the prison infirmary, stating that he could not have a brace because it contained metal and he could not have an ice pack. Plaintiff claims Clark failed to prescribe the pain medication recommended by Dr. Carls. *Id.* at 5-6. Plaintiff alleges that Corizon medical staff failed to remove his stitches in a timely manner and there was scabbing over the stitches. *Id.* at 6.

Plaintiff received a brace on August 14 or August 16, 2020. Plaintiff believes the brace caused something to come loose in his knee. *Id.* at 6.

On August 20, 2020, Plaintiff was taken to the hospital for surgery to remove his stitches. *Id.* at 7.

On September 28 and 29, 2020, Plaintiff informed doctors of his continuing knee problems and lack of recommended pain medication. *Id.* at 8. For one week in October 2020, Plaintiff was provided the pain medication recommended by Dr. Carls. *Id.*

Plaintiff asserts that Hoover failed to act in a timely manner given the severity of his injury, placed him at risk for reinjury by confiscating his brace and ice pack, and failed to provide pain medication. *Id.* at 9. Plaintiff alleges that Clark gave false statements to the Warden, by stating that he was content with his post-operative pain medication. *Id.* Plaintiff alleges that "Corizon/medical staffs" failed to provide him with proper treatment for his left knee. *Id.* at 10. As relief, Plaintiff seeks a consultation with a different medical doctor, another surgery, and ten-million dollars for pain and suffering. *Id.* at 10.

**B. Defendants' Response**

Defendants filed with their dispositive motion 500 pages of Plaintiff's verified medical records and declarations by Hoover and Clark.   These documents provide the following information.

On May 25, 2019, an attending nurse noted minimal edema (swelling) around Plaintiff's left knee.   The joint appeared stable, though Plaintiff could only bear weight on it for a short period of time.   The nurse gave Plaintiff crutches, ace wraps, accommodations for ice, no work, no recreation, and feed-in status, and contacted Nurse Practitioner Beverly McLaughlin, who ordered Advil and an x-ray of Plaintiff's left knee.   The nurse also recommended Plaintiff to "RICE" – rest, ice, compression, and elevation.   Declaration of Holly Hoover, ECF No. 20-2 Ex. A: ¶ 5.

On May 27, 2019, Plaintiff saw a nurse for concerns about his swollen knee.   The nurse noted that Plaintiff had injured his knee on May 25, 2019, and was given crutches, placed on feed-in, no work and no recreation status, advised to elevate and place ice on the knee, and an x-ray had been ordered.   ECF No. 20-3 at 5, 9.

On May 31, 2019, Plaintiff left knee was x-rayed.   The x-ray showed no acute osseous abnormality but a small focal soft tissue calcification on the lateral aspect of the knee joint (*i.e.*, evidence of chronic arthritis, a degenerative condition).   ECF No. 20-3 at 380.

On June 7, 2019, a nurse saw Plaintiff for complaints of left knee pain.   ECF No. 20-3 at 3-4.   The nurse noted that Plaintiff's x-ray showed some changes at or near the injury site.   At the time of this encounter Plaintiff was using an Ace wrap but was not using crutches.   The nurse referred Plaintiff to a provider.   *Id*.   Plaintiff had a prescription for Advil.   ECF No. 20-2 ¶8.

On July 15, 2019, Hoover saw Plaintiff for complaints of left knee pain.   Plaintiff reported that his knee pain, including in the medial aspect (middle) of the knee, was worsening.   ECF No.

20-2 ¶ 9; ECF No. 20-3 at 15.  He stated that he was able to put weight on the knee but had a limp.

Hoover noted the x-ray results.  Examination revealed tenderness of the medial knee and mild pain

with motion. Hoover requested physical therapy and advised Plaintiff not to play basketball.  *Id*.

Hoover states that she would have prescribed pain medication had Plaintiff requested.  ECF No.

20-2 ¶ 10.

Based on her examination, Hoover believed Plaintiff had a knee sprain that could be

conservatively treated.  ECF No. 20-2 ¶ 9.  Hoover explains that when a patient presents with an

acute knee injury, the first step is treatment with the RICE protocol.  The next step is to take an x-

ray to rule out bone abnormalities.  Unless there is evidence of gross injury, which was not the

case here, the next step is to follow a conservative course of treatment that includes physical

therapy.  If conservative treatment is unsuccessful, additional diagnostic imaging and surgery,

where necessary, may be considered.  *Id*.

On July 18, 2019, a physical therapist evaluated Plaintiff, who reported slight improvement

since his initial injury but stated that his knee was still swollen and gave out.  ECF No. 20-3 at 14.

The physical therapist observed that Plaintiff's gait was mildly antalgic (a limp that develops in

response to pain), though Plaintiff's transitional movements were non-antalgic (indicating a

possible exaggeration of symptoms) and recommended physical therapy.  ECF No. 20-2 No. ¶ 11;

20-3 at 14.

On August 3, 2019, a nurse saw Plaintiff for complaints of left knee pain.  ECF No. 20-3

at 21.  The nurse discussed Plaintiff's planned physical therapy.  *Id*.

On August 25, 2019, Hoover examined Plaintiff for complaints of knee pain.  Hoover

reported that Plaintiff had valgus stress (a test to assess the integrity of the medial collateral

ligament, or "MCL", of the knee) and moderate pain with motion.  Hoover prescribed ibuprofen

and ice, ordered no heavy lifting for Plaintiff, and submitted a request for an orthopedic consultation.   In that request, Hoover indicated that conservative treatment had proved unsuccessful.  ECF No. 20-2 ¶ 13; ECF No. 20-3 at 19, 23-24.

Plaintiff was provided physical therapy from August 27, 2019, to September 26, 2019. ECF No. 20-3 at 26-40.   Plaintiff was discharged from physical therapy on October 1, 2019, and reported limited benefit from physical therapy, though his gait was observed as minimally antalgic, and his knee had no swelling or inflammation.  *Id*. at 229.

On September 20, 2019, orthopedist Dr. Carls saw Plaintiff for complaints of left knee pain.  ECF No. 20-3 at 237-38.  Carls recommended an MRI of Plaintiff's left knee.  *Id*.

On October 9, 12, and 16, 2019, Plaintiff was seen by nursing staff for his left knee pain. On October 9, 2019, the nurse noted that Plaintiff walked without difficulty, was in no acute distress, and had full range of motion ("ROM") without inflammation of the knee.  The nurse recommended continuing Plaintiff's plan of care until his MRI.  *Id.* at 41. On October 12, 2019, Plaintiff reported that he was working when he heard his left knee "pop," causing pain.  He stated he was unable to walk without pain and had to hop.  *Id*. at 43-45. The nurse observed no swelling, wrapped an Ace bandage around Plaintiff's left knee and referred him to a provider.  *Id*.  Plaintiff was provided crutches on the following day.  *Id*. at 258.  On October 16, 2019, a nurse reported that Plaintiff's left knee was swollen.  Plaintiff was referred to a provider.  *Id*. at 48-49.  On October 17, 2019, Hoover issued a verbal order to excuse Plaintiff from work and place him on bed rest and feed-in status until October 31, 2019.  *Id*. at 50; ECF No. 20-2 ¶ 22.

On October 21, 2019, Plaintiff reported to Hoover that physical therapy had not improved his knee condition.  Plaintiff said that the onsite orthopedist[6] had recommended an MRI.  Hoover

---

[6]   The record is unclear whether Dr. Carls was an onsite or offsite medical provider.

observed that Plaintiff was using crutches and unable to place weight on his leg.  Plaintiff reported tenderness and mild pain when he moved his left knee.  Hoover states that off-site medical providers' records should be provided to the medical staff at NBCI, and that she was unaware prior to the October 21, 2019 appointment that Dr. Carls' medical report had not been forwarded to the facility.  Hoover requested that the note be obtained.  ECF No. 20-2 ¶ 23; ECF No. 20-3 at 53-54.

On October 31, 2019, Hoover reviewed Dr. Carls' report and requested an MRI of Plaintiff's left knee, and an orthopedic follow-up.  ECF No. 20-2 ¶ 24; ECF No. 20-3 at 51-52, 57, 58.

On November 19, 2019, Plaintiff had an MRI of his left knee which showed a complete tear of the anterior cruciate ligament, a bucket-handle tear of the medial meniscus, a small tear of a discoid lateral meniscus, and moderately large joint effusion.  ECF No. 20-2 ¶ 26; ECF No. 20-3 at 219-20.

On November 24, 2019, Plaintiff was transferred to Western Correctional Institution.  Hoover has not seen Plaintiff since the transfer.  ECF No. 20-2 ¶ 27; ECF No. 20-3 at 60-61.

On December 27, 2019, Dr. Bernard McQuillan reviewed Plaintiff's left knee MRI and submitted an orthopedic surgery consult request.  ECF No. 20-3 at 67-69.

On February 11, 2020, Dr. Carls saw Plaintiff in follow-up for complaints of left knee pain.  Plaintiff stated that he had been taking medications for pain relief.  Plaintiff's left knee was tender, swollen, had limited range of motion and normal muscle strength.  *Id.* at 225-226.

On March 6, 2020, NP Janette Clark saw Plaintiff for left knee pain.  Declaration of Janette Clark, ECF No. 20-4 ¶ 10; ECF No. 20-3 at 74-75.  Plaintiff requested stronger medications, stating Tylenol, ibuprofen, and Baclofen provided ineffective relief.  Clark explained to Plaintiff that no medication would alleviate all his pain and ordered Mobic (a nonsteroidal anti-inflammatory drug

that treats moderate to severe pain and inflammation) for the morning and Robaxin (a muscle relaxer) for the evening, a knee sleeve and requested left knee arthroscopy with meniscus repair. Plaintiff appeared to be in no distress but reported tenderness upon examination of his left knee. *Id*; *see also* ECF No. 20-3 at 72-73.

On May 12, 2020, Dr. Asresahegn Getachew informed Plaintiff that his knee surgery had been scheduled. Getachew also indicated that "Offsite visits will not resume until it is safe due to the COVID-19 crisis." ECF No. 20-3 at 84.

On June 22, 2020, Dr. Benhur Mohammed added Tylenol to Plaintiff's pain medication regimen. *Id*. at 88.

On July 3, 2020, Clark examined Plaintiff, and reported his knee showed no effusion (joint swelling). She submitted requests for Plaintiff's anticipated needs for post-operative follow-up, orthopedic follow-up, and physical therapy. ECF No. 20-4 at ¶ 17; ECF No. 20-3 at 92-93; 95-96, 98-100.

On July 31, 2020, Plaintiff had surgery on his left knee to reconstruct his anterior cruciate ligament and perform a partial medial meniscectomy by removing about half of the inner half of the medial meniscus. "Plaintiff's poke-hole incisions (in other words, the incisions used to gain access to the knee) were closed with 3-0 Monocryl suture, an absorbable suture." ECF No. 20-4 ¶18. Plaintiff returned from the hospital to WCI the same day and was admitted to the infirmary where he was evaluated by Clark. ECF No. 20-3 at 109-11; *Id*. at ¶ 19. Clark applied a CoolJet[7] ice machine to Plaintiff's left knee, advised him to use the ice machine as much as possible to reduce swelling, provided crutches, and prescribed acetaminophen-codeine (a narcotic medication) to be administered while he was in the infirmary. Pursuant to the surgeon's

---

[7] The record contains no description of the CoolJet machine.

instructions, Clark advised Plaintiff to begin weight bearing activity as tolerated and ROM exercises the following day.  ECF No. 20-3 at 109-11, 399; ECF No. 20-4 ¶¶19, 20.

On August 1, 2020, at or about 7:47 a.m., a nurse saw Plaintiff in the infirmary.  Plaintiff was in no apparent distress and was not using the CoolJet ice machine.  Plaintiff requested to return to his housing unit.  ECF No. 20-3 at 118-19.

On August 1, 2020, at or about 11:12 a.m., Clark saw Plaintiff in the infirmary.  Plaintiff reported that his post-operative pain was tolerable with current medications.  Plaintiff stated he no longer wanted Robaxin because it was ineffective.   Clark discontinued Robaxin.   Plaintiff exhibited mild to moderate edema and mild ecchymosis (discoloration of the skin, usually resulting from bruising).  Plaintiff's incision sites were clean with no signs of infection.  Clark advised Plaintiff to continue taking Mobic, prescribed Tylenol Extra Strength for breakthrough pain, and prescribed aspirin for deep vein thrombosis prophylaxis.  Clark recommended that Plaintiff do foot pumps and begin ROM and weight bearing as tolerated.  Clark had submitted a request for physical therapy but the physical therapist was not back on site.  She ordered crutches for 30 days, ice, and a bottom bunk, and requested a follow-up appointment for Plaintiff with the surgeon.  She also removed the metal from Plaintiff's post-surgical knee brace.  ECF No. 20-3 at 120-21; ECF No. 20-4 ¶ 22.

In her declaration, Clark explains:

> The knee surgery Plaintiff underwent was a same-day surgical procedure. In other words, if Plaintiff was not incarcerated, he would have been released to recover at home. Patients at WCI who receive surgery under general anesthesia are generally monitored overnight in the infirmary and then discharged back to their housing unit if they exhibit no signs or symptoms of complications from general anesthesia and/or their procedure. In this case, Plaintiff did not complain of or exhibit complications from surgery and requested to be discharged back to his housing unit. Therefore, it was appropriate to discharge him back to his housing unit on August 1, 2020.

> I understand the patient complains that I did not prescribe opioid pain medications after his minimally invasive arthroscopic surgery. I recall that, in the patient's discharge papers, the patient's surgeon, Dr. Carls, recommended NSAIDs, ice, and ROM exercises. Dr. Carls did not recommend opioid pain medications. Additionally, the patient did not exhibit signs or symptoms of severe pain. If the patient had exhibited signs or symptoms of such, I would have reevaluated my pain medication prescriptions. I was also unaware of any complaints of acute post-surgical pain.

> I understand the patient alleges that I confiscated his CoolJet machine and knee brace. I removed metal from the patient's knee immobilizer because metal is not allowed at WCI, a maximum security prison, for security reasons. In any event, metal stays were not medically necessary. The neoprene knee brace provided to the patient helped provide stability and applied gentle compression to decrease swelling. A CoolJet machine was also not allowed in the patient's housing unit for security reasons. The patient, however, had access to ice in his housing unit, which provides the same effects as the CoolJet machine.

ECF No. 20-4 ¶¶ 23-25 (internal citations to the record omitted).

On August 11, 2020, Plaintiff returned his knee brace because it did not fit. Clark was unaware that Plaintiff had returned the knee brace until she reviewed Plaintiff's medical records for the purposes of preparing her declaration. ECF No. 20-3 at 124; ECF No. 20-4 ¶ 26.

On August 13, 2020, Dr. Mohammed saw Plaintiff for complaints of severe, worsening knee pain, aggravated by movement and standing. Mohammed noted left knee swelling and requested an orthopedic evaluation. ECF No. 20-3 at 126-127, 129-130.

On August 14, 2020, a nurse removed two of Plaintiff's sutures, noting that the sutures had been in place for 15 days and that scabbing over the incision made removal difficult. ECF No. 20-3 at 128. One stitch remained in his knee. *Id*. at 132.

Clark states in her declaration that a fifteen-day period between surgery and suture removal is not unusual and does not represent a delay in treatment, and the scabbing at the incision site was a normal part of healing. ECF No. 20-4 at ¶ 28.

On August 15, 2020, Plaintiff received a knee brace.  ECF No. 20-3 at 131; 137.

On August 18, 2020, Plaintiff's physical therapy evaluation indicated his gait was stable with crutches and he exhibited mild edema with impaired active ROM and functional mobility. The therapist recommended twelve sessions of physical therapy.  *Id*. at 133.

Plaintiff was provided physical therapy on August 19, 24, 26, and 31, 2020, and September 2, 2020.  He ended the September 2, 2020 session because of pain.  *Id.* at. 132, 138, 140-41, 143.

On August 20, 2020, Dr. Carls saw Plaintiff for orthopedic follow-up.  Carls noted that Plaintiff was stable, had mild swelling, and complained of severe radiating pain.  Plaintiff reported that the Tylenol provided to him did not help.  Carls recommended physical therapy.  No recommendations for pain medication were made at that visit.  *Id*. at 223-24.

On August 23, 2020, Plaintiff told the nurse that Dr. Carls had told him that he would be prescribed Tramadol and instructed him to allow the stitch to work its way out and allow nursing staff to remove it.  *Id*. at 134-35.

On September 1, 2020, Plaintiff told a nurse that he removed the last suture in his knee despite instructions to leave the suture in place.  He reported knee pain and "popping."  *Id*. at 144.

On September 11, 2020, Plaintiff complained about left knee pain and "popping."  *Id*. at 146-47.  The nurse observed no swelling, redness, or warmth, and referred Plaintiff to a medical provider.  *Id*.

On September 28, 2020, Dr. Mohammed saw Plaintiff, who reported pain aggravated by walking or standing, crepitus (crackling or a grating sound), decreased mobility, instability, limping, and swelling, but denied bruising, locking, numbness, spasms, tingling, and weakness. Examination showed swelling and mildly reduced ROM.  Mohammed prescribed Indomethacin (an NSAID) and requested Tramadol (an opioid-like pain medication) and an orthopedic

evaluation.  ECF No. 20-3 at 152-53, 154. 156-57.  On October 1, 2020, Dr. Getachew approved the request for Tramadol.  ECF No. 20-3 at 150-51.

On October 2, 2020, Dr. James Bertie examined Plaintiff for complaints of left knee pain. Dr. Bertie discussed Plaintiff's condition with the physical therapist and advised Plaintiff to give the knee time to heal.  Bertie noted clicking in Plaintiff's left knee but observed that Plaintiff did not appear to be in severe pain.  Bertie indicated that he would request a telemedicine consultation with Dr. Carls and ordered a left knee x-ray for Plaintiff.  *Id*. at 160-62.

On October 27, 2020, Dr. Mohammed saw Plaintiff for complaints of left knee pain, crepitus, decreased mobility, instability, limping, and swelling.  Examination revealed subluxation of the patella and mildly decreased ROM.  Mohammed prescribed Tylenol Extra Strength and Indomethacin, and requested an orthopedic evaluation.  *Id*. at 170-173.

On November 12, 2020, orthopedic surgeon Dr. Ashok Krishnaswamy saw Plaintiff during a telemedicine visit for persistent left knee pain with clicking and giving out.  Plaintiff's knee showed tenderness medially and anteriorly and clicking on flexion and rotational movements. Plaintiff had near full ROM.  Dr. Krishnaswamy recommended an MRI of the left knee with the potential for surgery.  He recommended Plaintiff continue to use the knee brace and take Indocin and Tramadol for pain.  *Id*. at 172-73, 176, 233-34.

On November 27, 2020, Plaintiff asked a nurse about the status of his MRI.  The nurse spoke with NP Clark, who stated that she would review Dr. Krishnaswamy's recommendations. *Id*. at 177.

On November 29, 2020, Clark reviewed Plaintiff's chart but could not find Dr. Krishnaswamy's report.  Clark sent an inquiry to an off-site scheduler to obtain the report and to clarify why Plaintiff did not follow up with his original surgeon.  Clark determined that Mobic and

Robaxin were appropriate at that time and that Tramadol was not indicated. Clark noted that prior to surgery Plaintiff had reported that Robaxin was effective. Clark states she was unaware before the November 29, 2020, chart review that Krishnaswamy's report had not been sent. *Id*. at 179; ECF No. 20-4 ¶ 47.

In December of 2020 and January 2021, Plaintiff reported to nurses at WCI that he had a popping sensation in his left knee when walking and that he had fallen when his leg gave out. Plaintiff was provided Tylenol which was added to his existing prescriptions for Mobic and Roboxin. ECF No. 20-3 at 180-86.

On January 10, 2021, Plaintiff reported to Clark that he initially did well after left knee surgery but had since developed severe pain. Clark noted that Plaintiff used a left knee brace and crutch, performed exercises, and took Tramadol to manage pain. Upon examination, Clark observed Plaintiff's left knee appeared unstable. Clark provided him with a cane, submitted requests for an MRI, and a request to extend his Tramadol prescription. She reminded Plaintiff that he must take Tramadol in front of the nurse. ECF No. 20-3 at 190-93, 194-96, 206.

On January 23, 2021, a nurse observed Plaintiff walking quickly and steadily down steps without sign discomfort. Plaintiff identified himself and was provided his prescribed dose of Tramadol. Plaintiff took the medicine cup and dumped the pill it contained into his face mask. The nurse instructed Plaintiff to take the medication as required, but he walked away without complying. Plaintiff then ran the steps to the upper tier. ECF No. 20-3 at 204.

On January 25, 2021, a laboratory test revealed no Tramadol in Plaintiff's blood. On January 29, 2021, Plaintiff was informed that the Tramadol prescription was discontinued for suspected diversion and failure to take the medication in front of a nurse. *Id*. at 221, 206.

On February 10, 2021, an MRI of Plaintiff's knee was performed.  The results showed an intact ACL repair and a complex nondisplaced tear of the posterior horn of medial meniscus.  *Id*. at 445-46.

On February 14, 2021, Clark reviewed Plaintiff's MRI results and requested an orthopedic assessment with Dr. Carls, the surgeon who performed Plaintiff's surgery.  *Id.* at 215-16.  The medical record shows that in response to this request, Corizon reviewers determined, "[b]ased on the information provided, medical necessity not demonstrated at this time.  IM [inmate] had a repair of his ACL.  Bucket handle meniscal repair was not repairable based on previous orthopedic notes.  Consider initiating PT."  *Id*. at 495-98.

On March 30, 2021, Dr. Getachew saw Plaintiff and noted tenderness on the posterior aspect of the knee.  Plaintiff was able to fully extend the knee but it gave way with rotation.  Plaintiff reported pain squatting and pivoting.  Getachew prescribed Cymbalta and his request for an orthopedic evaluation was approved.  *Id.* at 432-36; ECF No. 20-4 ¶ 58.

On May 11, 2021, Dr. Carls recommended surgery for Plaintiff.  Defendants state that Plaintiff will be scheduled for a follow-up appointment with an on-site provider to review Dr. Carls' recommendations and to determine the next steps.  ECF No. 20-3 at 502-03; ECF No. 20-4 ¶ 59.

In her declaration, Clark states:

> To the extent Plaintiff complains of a delay in undergoing surgery, I am not involved in scheduling off-site appointments. Further, the COVID-19 pandemic caused statewide delays in elective surgeries such as Plaintiff's knee arthroscopy. Indeed, elective surgeries were paused statewide during the height of the COVID-19 pandemic. Plaintiff's off-site specialist appointments and surgery were scheduled in the normal course of business and within the constraints of any applicable COVID-19 restrictions and the availability of the correctional staff and off-site medical provider.

ECF No. 20-4 ¶ 60.

**STANDARD OF REVIEW**

The purpose of a Motion to Dismiss under Rule 12(b)(6) is "to test the legal sufficiency of a complaint and not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999)). As the legal sufficiency of the complaint is challenged under a Rule 12(b)(6) motion, the court assumes the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations. *Eastern Shore Mkts. v. J.D. Assocs. Ltd. Partnership*, 213 F.3d 175, 180 (4th Cir. 2000) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). A Rule 12(b)(6) motion to dismiss "should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true, it appears certain that plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Migdal v Rowe Price-Fleming Intl, Inc.*, 248 F.3d 321, 325 (4th Cir. 2001); *see also Venkatraman v. REI Sys, Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). Furthermore, the "Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Rather, Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal*, 248 F.3d at 325-26; *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue

as to any material fact. However, no genuine issue of material fact exists if the nonmoving party

fails to make a sufficient showing on an essential element of his or her case as to which he or she

would have the burden of proof. *Celotex,* 477 U.S. at 322-23.  On issues on which the nonmoving

party has the burden of proof, it is his responsibility to confront the summary judgment motion

with an affidavit or other similar evidence showing that there is a genuine issue for trial. *Anderson*,

477 U.S. at 256.

In considering a motion for summary judgment, the "judge's function is not himself to

weigh the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial." *Anderson*, 477 U.S. at 249.  A dispute about a material fact is genuine "if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at

248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors

one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving

party] on the evidence presented."  *Id.* at 252.  In this inquiry, a court must view the facts and the

reasonable inferences drawn "in the light most favorable to the party opposing the motion."

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United

States v. Diebold, Inc*., 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Fed. Credit Union*,

424 F.3d 397, 405 (4th Cir. 2005).

This court also is mindful that because Plaintiff is self-represented his filings are liberally

construed.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## DISCUSSION

## I.  Eighth Amendment Claims

In order to state an Eighth Amendment claim for inadequate medical care, a plaintiff must

demonstrate that the actions of the defendants or their failure to act amounted to deliberate

indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Deliberate indifference requires proof that, objectively, the inmate was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure that the needed care was available.  *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious in that it "has been diagnosed by a physician as mandating treatment" or is one that is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id*. (citation omitted).  Subjectively, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively 'knows of and disregards ah excessive risk to inmate health or safety.'" *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id*. "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id*. "Deliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (internal alterations omitted).  Further, even if subjective knowledge is established, an official may avoid liability if the official "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).  Against this background, this Court consider the claims against each Defendant.

### A.  Corizon

Corizon is a private corporation that has contracted with the Maryland Department of Public Safety and Correctional Services to provide medical care to prisoners confined in Maryland State prisons.  As private corporation providing services to a government agency may be held liable under § 1983 only if the violations alleged were the result of a custom or policy that results in the denial of constitutional rights.  *See Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658, 691, 694 (1978); *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999).

Plaintiff seeks to hold Corizon liable by claiming that "Corizon/medical staffs" failed to provide him with appropriate treatment for his left knee injury.  ECF No. 1 at 10.  *Respondeat superior*, the doctrine that holds an employer liable for the wrongful actions of an employee or agents, does not apply in §1983 actions.  *See Monell*, 436 U.S. at 690; *Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983).  Accordingly, the claims against Corizon will be dismissed.

### B.  Holly Hoover

Plaintiff claims Hoover improperly ordered physical therapy without diagnosing the severity of his injury.  ECF No. 1 at 3, 9.  Though Plaintiff may disagree with Hoover's medical decisions, the record does not suggest that Hoover was aware of a risk of serious harm to him and acted with deliberate disregard to that risk.  Based on examination, Hoover believed Plaintiff had a knee sprain that could be treated with conservative measures including physical therapy.  When informed this course of treatment was unsuccessful, Hoover requested an orthopedic consultation for Plaintiff.  Plaintiff's disagreement with the conservative medical care administered by Hoover does not constitute an Eighth Amendment claim.

### C.  Janette Clark

Plaintiff alleges that Clark improperly discharged him from the infirmary, confiscated the ice machine and a knee brace, and failed to prescribe post-surgical pain medication.  ECF No. 1 at 5, 9.  The record demonstrates that Clark examined, prescribed an analgesic, and advised Plaintiff to use the CoolJet machine and start exercises per Dr. Carls' recommendations.  Clark discharged Plaintiff from the infirmary with prescriptions for Mobic, aspirin, and Tylenol Extra Strength, a neoprene knee sleeve, crutches and orders for ice and a bottom bunk.  Clark also arranged for a follow-up visit and physical therapy for Plaintiff.  At discharge Plaintiff presented no complications from general anesthesia or signs of severe pain.  Notably, he requested to return to his housing unit.  Clark explains that inmates may not have a metal knee brace or a CoolJet in prison housing for security reasons.  Clark provided a sleeve to stabilize the knee and issued an order for ice for Plaintiff instead.

The record shows that Plaintiff received consistent medical attention for his knee injury and associated pain and that Defendants did not deliberately fail to provide treatment, delay treatment, or act with reckless disregard to his serious medical needs.  Plaintiff was provided different kinds of pain medication, x-rays and MRI studies, assistive devices (crutches, cane, knee braces), accommodations such as feed-in status, physical therapy, knee surgery, numerous evaluations by different medical providers including orthopedic surgeons and physicians, and for additional surgery.  Although Plaintiff may disagree with these medical decisions, disagreement between an inmate and a medical provider is insufficient to demonstrate deliberate indifference. *See Jackson*, 775 F.3d at 178; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam) ("Questions of medical judgment are not subject to judicial review.").  Accordingly, the Court will

grant summary judgment in favor of Hoover and Clark as to the Eighth Amendment claims against them.

## II.  False Statement

Plaintiff summarily alleges that Clark told the Warden of WCI that he was satisfied with his post-surgical pain medication.  Plaintiff asserts no violation of his constitutional rights or federal law and none is suggested.  In her declaration, Clark states that "[c]ontrary to the patient's allegations, I did not speak with the Warden at WCI about the patient's medical care, nor have I provided any statements to the Warden about the patient's medical care."  ECF No. 20-4 ¶5.  Plaintiff provides no information in dispute, and there are no allegations to suggest violation of federal law or constitutional moment.  Accordingly, this claim will be dismissed.

## III.  State Law Claims

In his Response in Opposition Plaintiff seeks to introduce new claims premised on negligence and torts and "State and federal civil rights violations."  ECF No. 23.  Briefs in opposition to a dispositive motion may not be used to amend a complaint or add new claims. *Mylan Laboratories, Inc. v. Akzo, N. V.,*770 F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)), *aff'd,* 2 F.3d 56 (4th Cir. 1993); *see also Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.,* 455 F. Supp. 2d 399, 436 (D. Md. 2006*)* (stating liberal pleading "does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage."); *Zachair Ltd. v. Driggs,* 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd,* 141 F.3d 1162 (4th Cir. 1998).  These claims are not properly before this Court and are dismissed without prejudice.

**CONCLUSION**

For the reasons stated in this Memorandum Opinion, Plaintiff's Motion for Appointment of Counsel will be DENIED.  Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment will be GRANTED.  A separate Order follows.


  10/18/2021                                    /s/
Date                                    RICHARD D. BENNETT
                                        UNITED STATES DISTRICT JUDGE